*Kelly-Larson v. State*, 133-3-16 Wncv (Teachout, J., May 5, 2017)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket No. 133-3-16 Wncv** |

**SHARON KELLY-LARSON**
    **Appellant**

    **v.**

**STATE OF VERMONT**
    **Appellee**

### DECISION ON APPEAL

Ms. Sharon Kelly-Larson, a licensed professional educator, appeals from a panel decision of the State Board of Education concluding that she engaged in unprofessional conduct and suspending her license for six months. She was a second grade teacher in the Milton School District. The matter is before the court for de novo review of the panel decision.[1] On appeal, Ms. Kelly-Larson takes issue with some evidentiary rulings and findings of fact below and argues that the facts do not rise to the level of the charged offense, which is grossly negligent conduct resulting in meaningful physical jeopardy, 16 V.S.A. § 1698(1)(A). Arguments were heard on February 21, 2017, after which both parties submitted supplemental briefing. The court has reviewed the record carefully and now determines as follows.

*Background and summary of underlying events*

Ms. Kelly-Larson has a Bachelor of Arts in Elementary Education, a Master's Degree in Special Education, and has been teaching for about 25 years. She is licensed as a special educator and as an elementary education teacher. During the underlying events, she was a second-grade teacher in the Milton School District.

The licensing action arose out of two events that occurred during the 2013–2014 school year. The first involved Student 1 in the cafeteria; the second involved Student 2 in Ms. Kelly-Larson's classroom. Briefly summarized, the cafeteria incident was as follows. Ms. Kelly-Larson's second-grade class was in the cafeteria about to line up for lunch. One of her students, Student 1, was walking around and not lining up in an orderly fashion. Ms. Kelly-Larson was alleged to have taken Student 1 by the arm, without causing him any distress, and brought him into the line where he was supposed to have been. Doing so violated the school's "no hands on" policy. The incident was reported to the administration. Ms. Kelly-Larson was reminded of the policy and instructed to take some relevant professional development courses, which she did. No licensing action was taken against her by the State at that time.

---

[1] In a prior decision, the court concluded that "de novo review" under 16 V.S.A. § 1707 is a form of record review and does not require a new evidentiary hearing as though the first one never occurred. No evidence was taken by the panel, during the Board's review, or during this appeal.

Later in the school year, the classroom incident, the focus of this case, occurred. While returning from lunch, Student 2 began exhibiting difficult, noncooperative behaviors. Once in the classroom, Student 2's behavior continued to worsen. Ms. Kelly-Larson was the only adult present. Unable to calm Student 2 down otherwise, she determined to take Student 2 to a "buddy room," a contiguous classroom where a child who needs to calm down may go. It is alleged that Student 2 refused to go to the buddy room and Ms. Kelly-Larson grabbed Student 2's arm in an effort at forcing her to go. This again violated the school's "no hands on" policy. Student 2 resisted Ms. Kelly-Larson's grasp and ran out of the classroom.

Following the classroom incident, the State charged Ms. Kelly-Larson with three counts of unprofessional conduct.[2] It charged her with two counts of grossly negligent conduct resulting in meaningful physical jeopardy in violation of 16 V.S.A. § 1698(1)(A), one count for each of the incidents described above, and one count of engaging in a pattern of willful misconduct in violation of 16 V.S.A. § 1698(1)(E), the pattern being the two events described above. The State sought a license suspension for one year minus a day.[3]

A hearing officer held an evidentiary hearing. He concluded that the cafeteria incident may have been "inappropriate and unjustified," but it did not rise to the level of gross negligence. He therefore found no violation under count 1.[4] He concluded that the classroom incident rose to the level of gross negligence or greater and "[f]or a child of that age, the risk of physical harm was meaningful and real." He therefore found a misconduct violation under count 2. He further concluded that all the facts considered together did not amount to a pattern of misconduct and therefore found no violation under count 3. He determined that a 6-month suspension of Ms. Kelly-Larson's license was appropriate.

The hearing officer's findings and conclusions were "recommendations" to a panel of the State Board of Education. 16 V.S.A. § 1705. The panel adopted the hearing officer's recommendations wholly and imposed the 6-month suspension. Ms. Kelly-Larson then appealed to the Board.

The Board's review is described at 16 V.S.A. § 1707(a)(2) as follows:

> The State Board of Education shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact. It may affirm the decision or may reverse and remand the matter with recommendations if substantial rights of the appellant have been prejudiced because the hearing panel's finding, inferences, conclusions, or decisions are:
> (A) in violation of constitutional or statutory provisions;
> (B) in excess of the statutory authority of the hearing panel;

---

[2] Whatever action the school district may have taken against Ms. Kelly-Larson in response to the classroom incident is not before the court. This case is limited to the licensing action taken against her by the State.

[3] Revocation or suspension for more than a year imposes on the State a clear and convincing burden of proof, whereas lesser discipline requires a preponderance of the evidence, the ordinary civil standard. 16 V.S.A. § 1704(b).

[4] The hearing officer did not make a finding on the "meaningful physical jeopardy" prong of the inquiry regarding the cafeteria incident, and since the element of gross negligence was not found, it was not necessary to do so.

(C) made upon unlawful procedure;

(D) affected by other error of law;

(E) clearly erroneous in view of the evidence on the record as a whole;

(F) arbitrary or capricious; or

(G) characterized by abuse of discretion or clearly unwarranted exercise of discretion.

The Board deferred to its panel and affirmed. Ms. Kelly-Larson then sought de novo review in this court. 16 V.S.A. § 1707(b). The State did not cross-appeal, so the only matter before the court is the propriety of the violation found, and sanction imposed, under count 2—the classroom incident.

*Analysis*

Here, the State largely urges the court to defer to the panel in the same manner as the Board did. Ms. Kelly-Larson objects to certain of the hearing officer's evidentiary rulings and findings of fact. She also argues that, in any event, the facts do not amount to "grossly negligent conduct or worse" that caused "meaningful physical jeopardy" to Student 2.

*Facts*

The court has reviewed the record closely. The court accepts the hearing officer's findings of fact, which have reasonable evidentiary support, with one exception described below. The findings document that, following the cafeteria incident, Ms. Kelly-Larson was clearly aware of the "no hands on" policy.[5] She knew that if a student was exhibiting behaviors that might require restraint of some kind that she could call for assistance from those authorized to place "hands on" for that purpose. Or, she could evacuate herself and her other students from the room in which the problem behaviors were occurring. Despite knowing this, she did neither and, in a second violation of the "no hands on" policy in the same school year, she grabbed Student 2's arm and attempted to force her to a buddy room against her will. Student 2 reported that the incident scared her and hurt her arm.

Immediately after the incident, Student 2 was taken to the school nurse. "The school nurse observed small pale blue dime size bruises to *both* of the child's arms, but could not identify their source." Panel Decision, Findings of Fact ¶ 73 (emphasis added). Student 2's mother testified that she had no reason to think that the bruises were caused by Ms. Kelly-Larson and it was possible that she herself had caused them. Without explanation, the hearing officer found that Mother's testimony was not "probative" and "it is more likely than not that the bruises were inflicted by" Ms. Kelly-Larson. *Id.* ¶ 87. This was the only finding of any physical harm resulting from the incident.

The finding that Ms. Kelly-Larson caused the bruises lacks any reasonable basis in the record and the court rejects it for that reason. The nurse who observed the bruises shortly after the classroom incident did not conclude that Ms. Kelly-Larson caused or could have caused

---

[5] In fact, there was no evidence that she was unaware of or misunderstood the "no hands on" policy at any time, including before the cafeteria incident.

them. There was no testimony or evidence of any kind showing that if Ms. Kelly-Larson had caused bruises that they could have become blue so quickly, or explaining why they would have been dime-sized. While an expert could explain the physiological process by which a bruise develops and may become blue in appearance, even a layperson generally knows that it takes time for a bruise to become blue. Nothing in the record suggests any reason to think that enough time could have passed between the incident and the discovery of the bruises that Ms. Kelly-Larson possibly could have caused them. Additionally, there was no evidence that Ms. Kelly-Larson grabbed *both* of Student 2's arms. Similar bruising, however, was observed on both of Student 2's arms. The hearing officer did not attempt to reconcile or rationalize any of this and, given the evidence before him, could not have. The finding that Ms. Kelly-Larson caused the bruise lacks support in the evidence.

The court declines to rule on other objections to evidentiary rulings or findings of fact. None of them would change the analysis or outcome in any material way. If any such rulings or findings were error at all, that error was harmless. V.R.C.P. 61.

*The statute*

The professional misconduct charge, as alleged, required the State to prove that Ms. Kelly-Larson engaged in "grossly negligent conduct or greater, on or off duty, that places a student or students in meaningful physical . . . jeopardy." 16 V.S.A. § 1698(1)(A). Neither expression—"grossly negligent conduct" or "meaningful physical jeopardy"—is statutorily defined and nothing in the record shows that either is a term of art with special meaning in this context.

Generally, gross negligence "is a heedless and palpable violation of *legal duty* respecting the rights of others." *Shaw v. Moore*, 104 Vt. 529, 531 (1932) (emphasis added), quoted in *Mellin v. Flood Brook Union School Dist.*, 173 Vt. 202, 220 (2001). "Stated differently, one who fails to exercise 'even a slight degree of care' or acts indifferently to the duty owed to another may be grossly negligent." *Mellin*, 173 Vt. at 220; accord *Kane v. Lamothe*, 2007 VT 91, ¶ 13, 182 Vt. 241 (it connotes "a wholesale absence of care or indifference to duty owed to" another).

"Jeopardy" generally means "exposure to or imminence of death, loss, or injury." Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/jeopardy. "Meaningful" suggests a level of significance. "Meaningful physical jeopardy" thus refers to some significant risk of physical harm.

To show a violation of 16 V.S.A. § 1698(1)(a), the State was required to prove by a preponderance of the evidence that Ms. Kelly-Larson breached a legal duty by exhibiting a lack of even the slightest degree of care and in doing so caused a significant risk of physical harm to Student 2.

4

*Gross negligence*

Neither the parties nor the hearing officer articulated the legal duty at issue or the applicable standard of care. All the testimony at the hearing was devoted to competing versions of the events. None was presented to explicate the applicable duty or standard of care, whether and how it was breached, and whether any such breach occurred "without the slightest degree of care" as distinguished from the ordinary negligence standard.

"Generally, negligence by professionals is demonstrated using expert testimony to: (1) describe the proper standard of skill and care for that profession, (2) show that the defendant's conduct departed from that standard of care, and (3) show that this conduct was the proximate cause of plaintiff's harm." *Estate of Fleming v. Nicholson*, 168 Vt. 495, 497 (1998).

The panel decision relies heavily on the school's "no hands on" policy, although virtually no testimony was devoted to explaining exactly what that policy is. It seems clear enough that a teacher who is not designated to use "hands on" is not supposed to physically restrain a child who may be in need of restraint except when that child presents a danger to self or others, a circumstance found not to be present here. There was no evidence that this policy is reduced to writing somewhere, or how the standard is meant to function in relation to all the occasional random physical contacts that must occur between second-grade teachers and their students on a daily basis, or where the line is between innocent contacts and barred contacts.

More importantly, the policy appears to be an internal policy of this particular school district. There was no evidence that it has a statutory or formal regulatory basis. The policy, and its breach by Ms. Kelly-Larson, is a relevant circumstance in this case. The policy describes a prophylactic practice employed by the school and it appears undisputed that Ms. Kelly-Larson deviated from it, but the policy cannot describe the breadth of a teacher's legal duty of care in general or as contemplated in 16 V.S.A. § 1698(1)(A). See *Kane v. Lamothe*, 2007 VT 91, ¶ 11, 182 Vt. 241 ("Generally, internal policies and manuals provide preferred standards but not legal requirements . . . ."). It does not, on its own, establish the standard of care for the State's charge of unprofessional conduct for purposes of State licensing requirements. Some teachers were allowed by the school to use "hands on" techniques. Others were not supposed to. No testimony explained what the correct "hands on" techniques would have been during the classroom incident, if any would have been indicated at all (there was no testimony either way), and how Ms. Kelly-Larson's actions deviated from those practices. While the policy may constitute a reasonable practice within a school, it does not equate to a required standard for licensing purposes such that a breach amounts to statutory unprofessional conduct resulting in licensing sanctions.

In any event, the facts of this case do not rise to the level of gross negligence as defined by law. It appears that the hearing officer concluded that because Ms. Kelly-Larson chose not to pursue alternative courses of action (calling for assistance or evacuating the classroom) and chose instead to violate the "no hands on" policy that she had been reprimanded for violating earlier in the year, she committed gross negligence. Knowingly violating the school's "no hands on" policy alone, however, is not enough.[6]

---

[6] Knowingly violating the school's internal policy a second time may have warranted some action by the school.

Negligence means less than reasonable care. Gross negligence is the absence of even the slightest degree of care; it means exercising no care at all. The line between the two is notoriously murky. Hence, distinguishing between them often is left to the finder of fact. In this case, the hearing officer had no relevant expertise in the education field. The panel that adopted his findings and conclusions did. The panel's finding is entitled to some deference, but deference is not a substitute for evidence that was not presented, findings not grounded in evidence, and conclusions that cannot reasonably follow from findings that do have evidentiary support.

The panel decision focuses too heavily on the breach of the "no hands on" policy and does not fairly consider the conduct, any risk of harm presented by it, and all the material circumstances. Student 2 began exhibiting difficult behaviors while returning from the cafeteria to the classroom. Ms. Kelly-Larson allowed her to lag behind the rest of the students hoping she would de-escalate. She did not. Once back in the classroom, Student 2, who was supposed to have been elsewhere with a social worker, began to escalate further. She did not yield to Ms. Kelly-Larson's "verbal redirection." She did not calm down when Ms. Kelly-Larson attempted to ignore the disruptive behavior. No other adults were present; other students were. Ms. Kelly-Larson then decided that Student 2 should go to a buddy room. Sending a student to a buddy room was one of the mechanisms used in the school to help disruptive students calm down. Student 2 did not want to go. In that moment, Ms. Kelly-Larson took Student 2 by the arm in an effort to make her go to the buddy room. However firmly she may have done so, Student 2 was able to promptly run away from her. There is no evidence that Ms. Kelly-Larson was acting in some kind of uncontrolled or overly aggressive manner, or otherwise acted inappropriately.

These circumstances may describe an error of judgment or a loss of presence of mind insofar as Ms. Kelly-Larson had other options that she should have pursued and did not, but as a matter of law they do not demonstrate 'the absence of even the slightest degree of care.' See *Hardingham v. United Counseling Service of Bennington County, Inc.*, 164 Vt. 478, 483 (1995) ("[A]n error of judgment or a loss of presence of mind . . . could be viewed as negligent, but not grossly negligent."), quoted in *Kane*, 2007 VT 91, ¶ 13. Plainly, Ms. Kelly-Larson was dealing with a difficult situation. Her several efforts at trying to calm Student 2 down had not worked. When she resorted to the buddy room option, from the point of view of the school's specific practices and standards, she deviated from the "no hands on" policy. There is no evidence or finding, however, that in doing so she was attempting to do anything other than calm down a child whose disruptive behavior was difficult, persistent, and getting worse. Gross negligence requires more.

---

The issue in this case is not how diligently Ms. Kelly-Larson followed the school's policies, however. As a general matter, the statute does not address the enforcement of school policies. It addresses risks of harm to students presented by educators' conduct, a matter that does not necessarily bear any necessary relation to a school's policies. Thus, any conclusion that Ms. Kelly-Larson should have known better before violating the policy the first time, and *really* should have known better the second time, does little to show that her conduct was grossly negligent in relation to the potential for harm to the student. Were it otherwise, the same conduct may be considered grossly negligent in a school with a particular policy and not so in another school without that policy, or with a different policy, all regardless of whether the actual conduct and risks presented meets the gross negligence standard.

*Meaningful physical jeopardy*

Even if the facts could support a finding of gross negligence, as a matter of law they do not support any finding on the second required element of the charge: resulting in meaningful physical jeopardy. Here, the vacated finding regarding the bruises is significant. That finding, in the panel's decision, implies that when Ms. Kelly-Larson took hold of Student's 2's arm, she did so with such force as to visibly injure both arms of a second-grader. Without that fact, the only evidence that could possibly support any finding of meaningful physical jeopardy is Student 2's statement that her arm hurt, and the testimony describing that Ms. Kelly-Larson held the arm firmly enough that she could maintain her grasp, however briefly, while Student 2 leaned away in resistance. This evidence is insufficient.

The hearing officer's conclusion of meaningful physical jeopardy is especially brief: "The student was young; a second grader. She was removed, off balance, from her seat. She was then pulled towards the door, against her resistance, and it scared her. *For a child of that age, the risk of physical harm was meaningful and real.*" Panel Decision, Conclusions of Law ¶ 15 (emphasis added).

The finding appears to be that Student 2 could reasonably *subjectively* be scared or perceive a risk of harm or that any second-grader in those circumstances might have felt the same. The statute, however, plainly contemplates an objective showing that meaningful physical jeopardy actually occurred. It is not clear that there is such a finding.

In any event, the evidence would not have supported it. Briefly holding the arm of a child to prevent her from running away or to lead her somewhere she does not want to go, as she leans away in resistance is all the record can bear and it is insufficient to meet an objective standard of "meaningful physical jeopardy."

There is no evidence in the record that Ms. Kelly-Larson used more force than necessary to briefly begin taking Student 2 to the buddy room against her will before she ran out of the classroom. There is no evidence that Ms. Kelly-Larson was acting in a violent manner, even if she was not using the school district's best practices, and no other circumstances whatsoever imply that there was any actual threat to Student 2's physical safety throughout the encounter. The evidence does not support a finding that the teacher's conduct placed the student in meaningful physical jeopardy.

*Conclusion*

The statutory provision at issue addresses conduct that falls on two spectrums: negligence, and risk-of-harm. The negligence spectrum encompasses behavior starting from non-negligent conduct through negligent conduct and then to grossly negligent conduct. For the conduct charged in this case, the evidence does not support gross negligence. The risk-of-harm spectrum starts from conduct that presents no risk of harm and runs through some risk of harm to significant risk of harm. The conduct in this case does not support significant risk of harm.

7

The statute penalizes only that conduct which is both grossly negligent and which presents a significant risk of farm. One can imagine conduct that would clearly fit in this category, such as a teacher who, while supervising a playground, allows young students to play in a road with busy traffic, or one who recklessly drives a van full of students at high speeds in heavy traffic. The incident at issue in this case comes nowhere near examples such as those.

While Ms. Kelly-Larson may have violated the school's "no hands on" policy, as a matter of law, the evidence does not support either gross negligence or a significant risk of harm to Student 2. The facts do not support grounds for professional discipline.

## ORDER

For the foregoing reasons, the decision of the panel of the State Board of Education determining that Ms. Kelly-Larson violated 16 V.S.A. § 1698(a)(A), and imposing a 6-month suspension of her license, is *reversed*.

Dated at Montpelier, Vermont this _____ day of May 2017.


_____
Mary Miles Teachout
Superior Judge

8